UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MARTIN GROSZ and LILIAN GROSZ,         Index No.: 09-CV-3706 (CM)(THK)
                                           (ECF Case)

          Plaintiffs,

    -against-

THE MUSEUM OF MODERN ART,         **FIRST AMENDED COMPLAINT**

         Defendant,

HERRMANN-NEISSE WITH COGNAC ,
SELF-PORTRAIT WITH MODEL
and REPUBLICAN AUTOMATONS,
Three Paintings by Grosz,

              Defendants-in-rem.
-------------------------------------------------------X

      Plaintiffs Martin Grosz and Lilian Grosz, the legal heirs of the deceased artist George

Grosz (together, the "Heirs"), through their undersigned counsel, Dunnington, Bartholow &

Miller LLP and Rowland & Petroff allege as follows:

## NATURE OF THE ACTION

      1.     This is an action for declaration of title, conversion and replevin of three paintings

currently located at the Museum of Modern Art ("MoMA") in New York City by the heirs of

George Grosz ("Grosz"), a world-renowned German artist who famously mocked Hitler and

fascism and who, upon Hitler's rise to power, fled Nazi Germany in fear for his life.  Upon

fleeing, Grosz left his artistic *oeuvre* in the hands of his Jewish art dealer Alfred Flechtheim who,

in turn, fled Nazi persecution and thereafter died and lost the Grosz artworks that are the subject

of this action.  Grosz' aesthetic vision inspired, for example, the look and feel of the nightclub in

the play and film *Cabaret* – the ultimate portrait of corruption, decay and exploitation in the Weimar Republic.

2.      By formal decree, the Nazis confiscated everything Grosz left behind when he fled Germany, including his paintings.  Grosz, whose works sounded political and religious themes, championed the common man and challenged totalitarian power and greed in pursuing unjust wars.  Grosz died a broken man.  He died a victim not only of Nazi persecution, but of an international network of unscrupulous art dealers, collectors and museums who operated before and after World War II behind a wall of silence and trafficked in and profited from art stolen during and after the Nazi period of rule.

3.      Grosz' work typified the "degenerate" art Hitler hated.  Although Grosz was not Jewish, Grosz' work was critical of the Nazis and sounded political and religious themes antithetical to Nazi doctrine.  When Hitler came to power, Grosz was one of the first artists to be declared an "enemy of the state" and his works were confiscated and banned from sale or display – destroying the value of Grosz' artworks then in stock with his dealer, Alfred Flechtheim.  Following this Nazi confiscation, each of these iconic and important Grosz artworks took a different – and hitherto concealed route to the Museum of Modern Art.

4.      The greatest art looting in history occurred during the reign of the National Socialists ("Nazis") in Germany (1933-1945).  As entire populations were massacred, displaced and despoiled, Hitler, a failed artist, pursued two main artistic agendas – a destruction or sale of "degenerate" Jewish or "modern" art, on the one hand, and, on the other hand, the acquisition of "Germanic" or classic art treasures.   In 1947, the *New Yorker* ran a three-part series by the famed Janet Flanner describing in great detail the extent and nature of Hitler's art looting, putting educated New Yorkers on notice of the scope and nature of Hitler's art looting.

2

5.      During the 1990's, as reflected in Lynn Nicholas' *The Rape of Europa* (1994), the Iron Curtain's fall and Clinton Administration pressures on countries to open sealed archives precipitated new provenance research on European artworks that flooded the United States from 1933 until the 1960's.   For the first time, researchers seeking the whereabouts of stolen artworks were able to trace and prove how many artworks from the Nazi period had been stolen.

6.      Upon winning World War II, the United States committed itself to reversing Nazi spoliation of persecutees and providing the U.S. courts as a forum to challenge acts of Nazi spoliation. Following World War II, the U.S. State Department warned U.S. museum directors and art dealers against acquiring Nazi looted artworks, but museums ignored the warnings.

7.      According to a front-page story in the *New York Times*, the U.S. recovered over 4,500 stolen European artworks in the U.S. from 1945 through 1962.   *See* Esterow, Milton, "Europe Is Still Hunting Its Plundered Art:  Hundreds of Millions in Treasures Elude Postwar Search", *New York Times*, November 16, 1964 at A1.  Hitler used the proceeds of sales of looted art to U.S. buyers to finance the Nazi war machine, concentration camps, and extermination of the Jewish population.

8.      Following World War II, a strong dollar, a starving Europe, and greedy art collectors led to a brisk traffic in stolen artworks in the U.S. that has been well-documented by scholars and the press.  As is well-documented by scholars, American collectors and museums amassed large quantities of stolen and unprovenanced artworks with suspicious post-1933 European origins.

9.      In the post-War period, museums loathe to look a gift horse in the mouth or pass up a bargain on a choice masterwork that a competitor would snap up, accepted donations and made bargain-basement acquisitions of artworks lacking provenance documentation.  In

exchange for donations of tainted artworks, wealthy patrons and trustees seeking to evade income taxes took generous tax deductions. It was in this atmosphere that the Museum of Modern Art acquired three important Grosz paintings.

   10. On December 3, 1998, the United States organized 44 countries to subscribe to the "Washington Principles on Holocaust-Looted Assets." The Washington Principles encouraged persons and heirs of persons despoiled by Nazi persecution to come forward with claims, relaxed evidentiary standards and discouraged museums from advancing technical legal defenses, preferring instead fair and just resolutions on the merits. http://www.lootedartcommission.com/Washington-principles. To avoid regulation by Congress, U.S. museums promised to drop the wall of secrecy, research their collections and publish provenance information to assist potential claimants.

11.     The first painting at issue is *Herrmann-Neisse with Cognac* by Grosz, 59cm x 73.5 cm (1928).



12.     A woman named Charlotte Weidler claimed that she "inherited" *Herrmann-Neisse with Cognac* in 1937 from Grosz' art dealer Alfred Flechtheim's estate.  This claim is and was demonstrably false.  MoMA claims title through Weidler and a dubious subsequent transaction with Curt Valentin, a Nazi agent and art dealer notorious for peddling artworks looted by the Nazis.

13.     The second painting at issue is *Self-Portrait with Model* by Grosz, 115cm x 74.5 cm (1929)..



14.     After Grosz' art dealer, Alfred Flechtheim, died from blood poisoning, a Dutch art dealer named van Lier, without any right, title or authority to do so, took artworks including *Self-Portrait with Model* from Flechtheim's consignment inventory and "auctioned" such artworks to himself through an auction held at Mak van Waay auction house.  Van Lier never obtained Grosz' consent as the owner of the artwork, before engaging in this void transaction. MoMA relies on this sham Dutch auction as the excuse for wrongfully retaining possession of *Self Portrait with Model*.   The Dutch art market historically lacked any moral compass.  When the Nazis came to power, they immediately snatched up artworks in Holland by Jews fleeing Nazi persecution.  Sham Nazi transactions "laundering" stolen art were centered in Holland.

6

Eventually, Kajetan Muhlmann "arguably the single most prodigious art plunderer in the history of human civilization" based Nazi operations in Holland to oversee laundering of title to artworks looted throughout the Reich. Petropoulos, Jonathan, *The Faustian Bargain* (Oxford University Press 1990) at 170-204).

15.     The third painting at issue is *Republican Automatons* (Republikanische Automaten), watercolor, pen and ink, 55.2cm x 42.5cm (1920).



16.     *Republican Automatons* followed the "Dutch Auction" fate of *Self-Portrait With Model*. *Republican Automatons* was sent by Flechtheim to Mayor Gallery in London in 1934. Van Lier improperly and without authority obtained *Republican Automatons* from the Mayor Gallery which was in possession of the painting. After Alfred Flechtheim's death, van Lier arranged for the transfer of the watercolor from London to Amsterdam and placed it up for auction on February 2-3, 1938, The watercolor was sold at the sham auction to Brant, together with three other watercolors and one drawing for a combined totally of 25 Dutch Guilders

(USD$15.92).  Brandt sold it to Dr. Herbert Tannenbaum in 1939, who soon thereafter sold it to Dr. William Landman.  Landman  sold *Republican Automatons* to MoMA in 1946.

17.     The paintings described in paragraphs 11-16 (the "Paintings") were all created and owned by George Grosz.  At no time did Grosz transfer title of the Paintings which were lost when Grosz fled Germany or when Grosz' dealer Flechtheim died.

18.     As set forth below, the Paintings have been "hiding in plain sight"; their provenance and true ownership obscured by a combination of sham transactions, archives sealed for decades and publications of misleading provenances that have until recently made it impossible for the Heirs to determine and demonstrate that title to these Paintings never left Grosz.

19.     In recent years, the Grosz heirs uncovered evidence relating to transactions involving the Paintings that had previously been unavailable.

20.     What this newly-discovered evidence makes clear is that Grosz never voluntarily parted with title to the Paintings.  MoMA knew or should have known this, but chose to either actively conceal the evidence or look the other way and deal under suspicious circumstances with disreputable dealers who provided doctored or missing provenances.

21.     Flechtheim's estate has represented that it has no claims to the Paintings and has renounced any potential rights in the Paintings.

22.     Under both New York law and German Civil law, once there is a "thief", an involuntary transfer, or the property is lost in the chain of title, no one can take good title.  No one took good title from Grosz during his lifetime with respect to the Paintings, and nothing following his death would defeat the Heirs' good title.

23.     This lawsuit was precipitated by MoMA's absolute refusal to toll the statute of limitations to permit additional research, negotiations, or non-contentious discussions, as well as MoMA's refusal to turn over all relevant documents.

24.     Since this court sits in diversity, under the *Erie* Doctrine, this court looks to New York law to determine title to the Paintings. New York's Estates, Powers and Trusts Law ("EPTL") 3-5.1(b)(2) in turn, looks to the domicile of the decedent Grosz, here Germany, to determine title and descent of personal property. Under the *Erie* Doctrine, New York's statute of limitations, burdens of proof, and procedural remedies apply.

25.     As set forth below, the Heirs rely on New York's law of replevin and conversion to obtain the prompt and expeditious return of the Paintings together with the reasonable costs and attorney's fees incurred in their recovery.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendant and the matter in controversy exceeds $75,000, exclusive of interest and costs.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a) and (c), because defendant is a New York not-for-profit corporation located in New York County and the Paintings that are the subject matter of this dispute are located in this judicial district.

28.     This Court has jurisdiction to grant the requested relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

29.     This Court is authorized by 28 U.S.C. § 1655 to exercise *in rem* and *quasi-in-rem* jurisdiction, declare title and order the Paintings' return because the Paintings are located in this judicial district.

## STANDING AND TIMELINESS

30.     Plaintiffs have standing under Section 1601 of New York's Surrogates Court Procedure Act ("SCPA") which permits heirs of foreign domiciled decedents to sue in their own names and personal capacities.

31.     Under New York law, a cause of action against a possessor of stolen property first arises upon defendant's refusal to convey the chattel upon demand by the true owner.  MoMA refused to return the Paintings on April 12, 2006.  This action is timely because it was commenced within three years of MoMA's refusal to return the Paintings.

## THE PARTIES

32.     Plaintiff Martin Grosz is a resident of Philadelphia, Pennsylvania and the surviving son of George Grosz.  By operation of German law, he is entitled to an undivided fifty (50%) percent share of Grosz' estate.

33.     Plaintiff Lilian Grosz is a resident of Princeton, New Jersey and the surviving wife of Peter Grosz, a son of George Grosz.  By operation of German law she is entitled to an undivided fifty (50%) percent share of Grosz' estate.

34.     Defendant  Museum of Modern Art is a New York not-for-profit corporation operating as a public museum located in New York County.

35.     The Paintings, Defendants-in-rem, are currently in the possession of MoMA.

## FACTUAL BACKGROUND

36.     Unless otherwise pleaded, all allegations asserted hereinafter in this Verified Complaint are upon information and belief.

**Exhibitions and Transactions of the Paintings Prior to 1933**

37.     Grosz' first exhibition was at Galerie Flechtheim in Berlin in 1923.  Grosz was a prolific artist and the exhibition successfully established Grosz' artistic reputation.  By 1925, Galerie Flechtheim paid Grosz monthly support payments (300 to 800 Reichmarks ("RM")) in exchange for being Grosz' exclusive dealer.

38.     In 1927, Grosz created *Herrmann-Neisse with Cognac* and consigned it to Galerie Flechtheim on April 24, 1928.  (Exhibit 1, No. 2, "Kleiner Portrait Max Herrmann (mit cognac flasche)")  In May 1928, *Herrmann-Neisse with Cognac* was exhibited at the Prussian Academy of Arts.

39.     In 1928, Grosz created *Self-Portrait with Model* and consigned it to Galerie Flechtheim in 1929. (Exhibit 1, #8, "Das Modell").

40.     In 1931, Galerie Flechtheim loaned *Herrmann-Neisse with Cognac* to MoMA where it was exhibited at the "Modern German Paintings and Sculpture" exhibition from March 13 to April 26.  MoMA's exhibition catalog indicates that it was "lent by Flechtheim Gallery, Berlin".  The MoMA catalog makes a clear distinction between loans and artworks from Flechtheim's private collection.  (Exhibit 2) (*Compare* "Collection of the Flechtheim Gallery, Berlin" *with* "Private Collection of Alfred Flechtheim, Berlin").

41.     In December 1931, Galerie Flechtheim cancelled its consignment agreement with Grosz and stopped making monthly support payments.  (Exhibit 3).  Notwithstanding the cancellation of the consignment agreement, Grosz' artworks, including the Paintings, remained in Galerie Flechtheim's possession.

42.    In 1932, the Palais des Beaux Arts in Brussels asked Galerie Flechtheim for *Herrmann-Neisse with Cognac* for a Grosz exhibition. Upon its return to Berlin, it remained with Galerie Flechtheim.

43.    On May 23, 1932, Flechtheim offered to renew the consignment agreement with Grosz. Flechtheim's letter indicated that Curt Valentin, Flechtheim's assistant, visited Grosz in New York to try to renegotiate a new exclusive consignment agreement with him. (Exhibit 4). In a subsequent letter, Grosz denied agreeing to enter into any exclusive relationship, but agreed to provide paintings to Galerie Flechtheim on a non-exclusive basis. (Exhibit 5).

44.    Prior to his death, Flechtheim never accounted to Grosz for the artworks sold, many works were never returned, are missing and still being sought by the Heirs.

45.    In 1932, Grosz visited New York City to teach a class at the Art Students League. During his stay in New York, he informed his wife that they needed to emigrate to the U.S. due to the rise of Nazi power. Grosz returned to Berlin for the winter of 1932.

46.    On January 12, 1933, just prior to the Nazis taking power, Grosz emigrated to New York with his wife. On January 30, Adolf Hitler was named Chancellor of Germany.

47.    It was Nazi practice to force Jews to liquidate their property and take the proceeds for the Reich either directly or in confiscatory "flight taxes". Prior to his flight from persecution, Flechtheim hired Alfred Schulte to liquidate Galerie Flechtheim's Düsseldorf and Berlin galleries. In connection with the liquidation, Schulte demanded payment from Grosz of a purported debt owed to Galerie Flechtheim in the amount of 16,255 RM. Schulte claimed that Grosz' artworks remained on consignment, but were unsellable. (Exhibit 6).

## Flechtheim's Transactions With the Paintings After Grosz' 1933 Flight

48.     In April 1934, Flechtheim wrote to Grosz in New York informing him that watercolors and oils Grosz had previously consigned were with galleries in London and Paris. Flechtheim added a price list of the oil paintings in Paris. *Self-Portrait with Model* was on the list of works sent to Galerie Billiet in Paris(Exhibit 7 at #8), *Republican Automatons* was on the list of works sent to Mayor Gallery in London (Exhibit 8), but *Herrmann-Neisse with Cognac* was not on either list. Flechtheim established consignment relationships with the galleries Mayor and Kahnweiler; however, no consignment lists mention *Herrmann-Neisse with Cognac*.

49.     On October 24, 1935, MoMA's director, Alfred Barr, wrote to Mrs. Stanley Resor:

> I have had a letter today from Alfred Flechtheim, the unfortunate refugee owner of Lehmbruck Standing Man. He seems to be in pretty dire straits. I think he might possible take as little as $2,000 for this really great modern figure. We might offer him even less. (Exhibit 9)

50.     On January 18, 1936, the wind-up and dissolution of Galerie Alfred Flechtheim G.m.b.H. in Berlin started. On the same date, Alfred Flechtheim made a will designating his nephew, Heinz Hulisch, as his sole heir. (Exhibit 10).

51.     Flechtheim sent several of Grosz' paintings, including *Self-Portrait with Model* to the Kunstzaal van Lier, an Amsterdam art dealership run by Carel van Lier, for a July-August 1936 sales exhibition. (Exhibit 11). The sales exhibition was unsuccessful, but the Grosz artworks remained at Kunstzaal van Lier in Amsterdam.

52.     On February 20, 1937, Galerie Alfred Flechtheim G.m.b.H. was officially dissolved and removed from Berlin's commercial registry.

53.     On March 11, 1937, Flechtheim died of blood poisoning in London after stepping on a rusty nail leading to the amputation of his leg.

54.     During 1941, in Berlin, Betty Flechtheim, Alfred Flechtheim's surviving wife, committed suicide due to Nazi persecution.

55.     Prior to Flechtheim's death, there is no evidence that Flechtheim disposed of *Herrmann-Neisse with Cognac* or that *Herrmann-Neisse with Cognac* escaped with Flechtheim from Nazi Germany.

**Van Lier's Sham Dutch Auction of *Self-Portrait with Model* After Flechtheim's Death**

56.     Following Flechtheim's death, in early 1938, an art dealer named Carel van Lier brought Grosz artworks to Amsterdam for a purported "auction".  Van Lier purported to auction paintings and drawings of Grosz that he had previously tried to sell for Flechtheim and failed.  At the "auction", van Lier purchased for himself the *Self-Portrait with Model* (Lot 278) for 16 Dutch Guilders (US$10.16).  *Self-Portrait with Model* was resold two months later for 150 Dutch Guilders (US$95.25), or a profit of over 900%.  The purchaser, Leo Lionni, who was art director for *Fortune* magazine from 1948 -1960, gave the painting as a gift to MoMA in 1954.

**Van Lier's Sham Dutch Auction of *Republican Automatons* After Flechtheim's Death**

57.     **Following Flechtheim's death in early 1938, van Lier arranged the transfer of *Republican Automatons* from Mayor Gallery in London.  Like with *Self-Portrait with Model*, van Lier arranged for the *Republican Automatons* to be sold at the "auction" held on February 1-2, 1938.  *Republican Automatons* was sold at the sham Amsterdam auction to Brandt, together with three other watercolors and one drawing, for a combined total of 25 Dutch Guilders (US$15.92).**

58.     Brandt apparently purported to sell *Republican Automatons* to a Dr. Herbert Tannenbaum in 1939 for an unknown amount, who soon thereafter sold the artwork to Dr. William Landman in Toronto.

59.     MoMA purchased *Republican Automatons* from Dr. Landman in February 1946.

### Flechtheim's Assistant, Curt Valentin, Becomes a Nazi Agent and Sets Up a Gallery in New York to Sell Nazi-Looted Artworks

60.     By November 1936, through numerous Nazi legislative acts, the cultural scene in Germany had been completely "cleansed" of Jews and Nazi opponents. However, on November 14, 1936, the Nazi Reich Chamber of Fine Arts gave a secret written authorization to Curt Valentin, Alfred Flechtheim's former assistant, to –

> … make use of your connections with the German art circle and thereby establish supplementary export opportunities, if [this is done] outside Germany. Once you are in a foreign country, you are free to purchase works by German artists in Germany and make use of them in America." [translated from original]. (Exhibit 12).

61.     This November 14, 1936 authorization given to Valentin by the Reich Chamber of Fine Arts made Valentin an agent of the Nazi government during his time in New York.

62.     Following his appointment as a Nazi agent, Valentin established the Buchholz Gallery in New York. The gallery was associated with Galerie Buchholz in Berlin, perhaps the largest and best-known dealer in Nazi-confiscated artworks.

63.     Valentin had been an assistant to Flechtheim and employed by Galerie Flechtheim. He knew Grosz, and had visited Grosz in New York to renew Grosz' consignment agreement. (*See* Exhibit 4).

64.     During the 1930s, Valentin traveled freely between Germany, Switzerland, France, and the United States.

65.     In December 1938, MoMA's Director Alfred Barr used Valentin to try to purchase Nazi-looted artworks belonging to German museums. *See* Letter of Curt Valentin to Alfred Barr dated December 5, 1938 (Exhibit 13).

**MoMA Purchases Nazi-Looted Artworks Through Valentin**

66.     On June 30, 1939, at the Fischer Gallery in Lucerne, Switzerland, the Nazis auctioned confiscated "degenerate" artworks to raise foreign currency. Reputable U.S. museums and dealers refused to finance the Nazi war machine and boycotted the auction. Valentin purchased on behalf of his Buchholz Gallery in New York. Shortly after, MoMA announced the acquisition of five paintings from Valentin's Buchholz Gallery.

67.     Prior to the Fischer Gallery auction, MoMA's Alfred Barr provided MoMA funds to Valentin. Following the auction, Barr wrote: "I am just glad not to have the museum's name or my own associated with the auction…. I think it very important that our releases … should state that [the works] have been purchased from the Buchholz Gallery, New York." (Exhibit 14 at 178).

68.     In 1940 Valentin was investigated by the Federal Bureau of Investigation for espionage. The FBI focused upon Valentin's continuing relationship with the Buchholz Galerie in Berlin, as well as his relationship with Bignou Art Gallery, which shared the same gallery space at 32 East 57th Street in New York City.

69.     Bignou Art Gallery shipped artworks seized by the British in Bermuda from the Vollard Collection confiscated by the Nazis in occupied France. British authorities determined Bignou's proceeds were intended for the Nazis.

70.     On June 30, 1942, Alfred Barr wrote:

> Mr. Valentin is a refugee from the Nazis both because of Jewish
> extraction and because of his affiliation with free art movements
> banned by Hitler.  He came to this country in 1937, robbed by the
> Nazis of virtually all possessions and funds.

Barr further praised Valentin's patriotism for Valentin's application to become a U.S. citizen.

(Exhibit 15).

71.     By 1942, Barr certainly knew that his statement on Valentin's behalf was

completely false.  Clearly, Barr was protecting MoMA's source of Nazi-looted artwork.

72.     On September 16, 1944, as published in the *Federal Register*, the U.S. Alien

Property Custodian seized the artworks and assets of Buchholz Gallery in New York as property

of Nazi Germany under the Trading with the Enemy Act.

73.     MoMA's website reveals approximately 30 artworks with a Nazi-era provenance

acquired from Curt Valentin, the Buchholz Gallery of New York,  and works known to have

been confiscated by the Nazis.

## Charlotte Weidler's False Claim To Have "Inherited" *Herrmann-Neisse with Cognac* From Flechtheim

74.     On January 27, 1937, Charlotte Weidler, a German art dealer, critic, and curator

for the Carnegie Institute in Pittsburgh, wrote that many German artists were expelled from

German museums and could not show their work, including "George Gross [sic] (now in New

York)."  *Archives of American Art Journal*, Vol. 25, No. 1&2, p. 21 (1985).

75.     On April 12, 1937, Charlotte Weidler wrote to German art historian and critic

Paul Westheim, claiming that  George Grosz' dealer Alfred Flechtheim gave her a number of

paintings as an "inheritance", including *Herrmann-Neisse with Cognac*.  According to Weidler,

Flechtheim wanted to thank her:

17

I almost forgot something. To my big surprise I inherited
something. Unfortunately no money. But paintings. As a token
of gratefulness. This surprised me particularly, because I have
long since gotten rid of the habit to count on gratefulness. It is,
which I would never have thought for my life, from Alfred
Flechtheim. I once did him a favor. In his carefree ways, he had
spent foreign currency for paintings that were from here, and he
would have had to hand in that currency because of the foreign
currency laws. They found out about this and it would have
caused him and his wife many difficulties. So we made an
exchange, I gave him my dollars and got deutschmarks. It helped
him and was no big deal for me and quickly forgotten. Also he
wants to thank me for spending time with his wife, who suffered
under the life in Germany and the persecution. Betty Flechtheim, a
fabulous being, Lotte Fürstenberg, Else Schiffer and I are together
a lot. Now he wants to thank me that I did not withdraw like so
many of those so-called "good friends", but that I, what I've
always taken for granted, always stood by her. It really touched
me, deeply. **In any case, I now have 9 paintings by George
Gross [sic], amongst those former museum-property, the big
artist-painting, an early, very exquisite one, the [*Herrmann-
Neisse with Cognac*] Max Herrmann-Neisse, the Marseille Girl,
the landscapes in Marseille and a still-life, that I admittedly
find only moderate. Then a drawing by George Gross [sic] and
an important early Pechstein: the women's house on Palau.** A
Serna wasn't good and I declined to take it. Now the question is
what to do with all these pictures. Selling will hardly be an option.
Anyways, it really pleased me. **Please don't publish this,
because otherwise I will only get in trouble, will have to pay
inheritance taxes and they will say, how come you are still in
contact with the Flechtheim Family.** (Exhibit 16 (emphasis
supplied)).

76.     Weidler's claim that she "inherited" *Herrmann-Neisse with Cognac* is false.

## Charlotte Weidler as a Suspected Nazi Agent

77.     In December 1939, Weidler emigrated to New York.

78.     In early 1942, an Assistant Director of the Freer Gallery of Art in Washington,

D.C., and a Trustee of the Carnegie Institute corresponded concerning suspicions that Weidler,

then with the Carnegie Institute's Fine Arts Department, was a Nazi agent. (Exhibit 17).

## Prior to the War, Weidler Takes Paul Westheim's Artworks and Never Returns Them

79.     Prior to fleeing Berlin, Paul Westheim left an important collection of modernist artworks in the possession of Weidler.  Westheim created a list of the artworks (including photos) he left with Weidler.  (Exhibits 18 and 19).

80.     In 1930, Weidler offered for sale to MoMA the art collection of Paul Westheim. Weidler sent the list of Westheim's artworks to Barr. (Exhibit 20).

81.     Westheim's copy of the list was lost when the Gestapo seized his Paris apartment.

82.     On April 4, 1947, Paul Westheim wrote to Barr requesting the list of Westheim's artworks provided to MoMA by Weidler.  Barr responded that MoMA would search for the list. Barr's secretary also wrote to Charlotte Weidler inquiring whether she still had a copy  of Westheim's list.  The letter to Weidler was returned undeliverable.  (*See* Exhibit 20).

83.     On February 13, 1947, Weidler's sister informed Weidler that her paintings survived the war.  Correspondence details a dispute between Weidler and a Mr. Lücke, who helped Weidler hide the paintings.  Lücke wanted to keep two Grosz paintings he held for Weidler during the war.  Lücke threatened to contact Grosz if Weidler demanded the paintings back.  *See* Charlotte Weidler papers at MoMA (MoMA has refused to permit Plaintiff's counsel to photocopy these papers).

84.     On June 20, 1959, Westheim wrote:

> The question of the whereabouts of my collection, which I left with
> Dr. Weidler when I left Berlin, is entangled in a mysterious secret.
> The behavior of Dr. Weidler in this matter, is, to say it moderately,
> embarrassing.  Until 1945 we had a vivid correspondence.  When I
> asked her about my collection after the war, she broke off all
> correspondence abruptly. (*See* Exhibit 18)

85.     On August 3, 1959, Westheim wrote that Weidler's sister recently gave an affidavit stating that Westheim's art collection was destroyed during the war. (*See* Exhibit 18).

86.     From the correspondence, it is clear that Weidler had a cache of stolen art that she had concealed which included works by George Grosz.

**Weidler Starts To Peddle Her Stolen Artworks To MoMA Through Valentin**

87.     On February 5, 1950, Weidler wrote to Barr.  She "claimed" that some of her paintings survived the war and she would soon arrive in New York.  She also informed Barr that she had a "strong early Grosz which once had belonged to the Kronzprinzen Palais and has been ousted by Hitler" for sale.  (Exhibit 21).

88.     Barr clearly knew Weidler was trying to sell a stolen Grosz to him.

89.     *Herrmann-Neisse with Cognac* was never exhibited at the Kronzprizen Palais.

90.     Sometime during 1952, Weidler asked Valentin to sell *Herrmann-Neisse with Cognac* for her.  Valentin contacted Alfred Barr and flipped the painting to MoMA on April 10, 1952.  Weidler's identity purportedly remained undisclosed during the transaction. *See* Charlotte Weidler papers at MoMA.

91.     MoMA's archives show no investigations by MoMA into ownership or provenance of *Herrmann-Neisse with Cognac*.  At the time, Grosz lived in New York.  Although MoMA knew where Grosz lived and taught, it never contacted him.

92.     *Herrmann-Neisse with Cognac* was damaged when MoMA acquired it.  Instead of asking Grosz to restore it, MoMA restored it for $75.  *Herrmann-Neisse with Cognac* was never signed.  MoMA never asked Grosz to sign it, nor did MoMA invite him to its first exhibition.

93.     A failure to invite an artist to the exhibition of his work is a serious breach of etiquette in the museum community.

## Weidler Sells Artworks Stolen From Westheim

94.    Prior to Westheim's death in 1963, Westheim prepared a statement listing his recollection of the artworks he left with Weidler in 1933. (*See* Exhibit 19).

95.    From 1970 to 1998, five paintings from Westheim's collection held by Weidler surfaced.  In 1970, the Leonard Hutton Galleries acquired *Still Life with White Bottle* by Ivan Puni.  In 1972, the Clemens-Sels Museum in Germany acquired *Roof Garden of the Insane* by Joachim Ringelnatz.  In 1977, art dealer Erwald Rathke acquired *To Beauty* by Otto Dix.  In 1996, *Portrait of Robert Freund II* was sold at Sotheby's in London.  In 1998, *Die Geigerin* by Erich Heckel was sold at Christie's in New York.

96.    Westheim had entrusted all of these paintings to Weidler in 1933 and each artwork's provenance indicates Weidler's "acquisition" from Westheim even though Weidler lied to Westheim by claiming the artworks were destroyed.

## Grosz' Artworks Stripped From German Museums As "Degenerate"

97.    In the spring of 1933, the Nazis burned books and artworks. A large part of Grosz' body of work was declared "degenerate" and completely destroyed.  Grosz was described by Nazi authorities as "one of the vilest representatives of degenerate art and acts like an anti-German." (Exhibit 22).

98.    On July 19, 1937, the Nazi exhibition Entartete Kunst ("Degenerate Art") opened in Munich.  Prior to the exhibition, the Nazis confiscated thousands of artworks; mainly those by German expressionist artists.  285 works by Grosz deemed "degenerate" were confiscated from German museums, and many were shown at the Munich exhibition.

## Grosz' Depression, Paralysis and Persecution

99.     In 1933, Nazi authorities confiscated Grosz' German bank accounts.  *See* George

Grosz, Briefe 1913-1959, p. 179.

100.    In August 1933, Grosz feared that the Nazis would arrest his mother.  The

Gestapo had gone to his two former apartments in Berlin.  He felt scared but lucky.  *See* George

Grosz, Briefe 1913-1959, p. 181.

101.    In October 1933, Eva Grosz returned to Germany to get their two sons, Martin

and Peter.  During the same month, Grosz' dealer Flechtheim fled Nazi persecution and moved

to Paris leaving behind his galleries in Düsseldorf and Berlin.

102.    On March 9, 1938, the Nazis revoked the citizenship of Grosz and declared his

assets in Germany confiscated.  On November 14, 1938, Eva Grosz' citizenship was revoked and

her assets confiscated.  (Exhibit 23).

103.    By decree dated January 18, 1939, Eva Grosz' property was ordered to be

declared state property effective January 26, 1939.  (Exhibit 24).

104.    By 1949, Grosz became increasingly depressed and started drinking abusively.

According to his wife's affidavit, Grosz isolated himself more and more from friends and

society.

105.    On January 8, 1953, while *Herrmann-Neisse with Cognac* was exhibited at

MoMA, Grosz wrote to his brother-in-law: "Modern Museum exhibited <u>a painting that was</u>

<u>stolen from me </u>(I am powerless against that) they bought it from someone, who stole it."

[Emphasis added].  In another letter to a friend dated January 9, 1953, Grosz wrote: "Modern

Museum bought a painting that was stolen from me... (one cannot do anything) old affair."

106.    In the early 1950's, anti-German sentiment in the U.S. was running high.  Grosz, an artist barely making a living, could not afford to challenge the U.S. art establishment for fear of losing his livelihood.  Grosz believed it was "artistic suicide".

107.    Grosz had spent a lifetime challenging the Nazi state and was fearful of being noticed by authorities.  He was the victim of hate mail against Nazis, even though he was an anti-Nazi.  He was the victim of anti-Semitic hate mail, even though he was not Jewish.  He feared ostracism and retribution of the art establishment if he pursued a claim against MoMA.

## Official Findings of Grosz' Persecution, Disability and Death

108.    In 1955, George and Eva Grosz submitted compensation claims to Germany for damages for loss of assets and property, damages to professional advancement and damages to body and health.  In connection to the compensation claims, a doctor examined the physical condition of Grosz.  The medical opinion found that Grosz started to suffer from breathing difficulties after his emigration to America.  This was followed by depression and severe headaches.  The depression led to anxiety, insomnia and agitated melancholia, which finally led to a complete collapse of his creative capacity.  This state aggravated with time.

109.    On February 6, 1959, the German compensation office issued a decision awarding Grosz damages for bodily injuries and damage to health due to Nazi persecution.  (Exhibit 25).

110.    On July 6, 1959, Grosz died in Berlin after a long night of drinking.

111.    In August 1959, Eva Grosz submitted a restitution claim for the loss of her husband's life.  A medical opinion found that Grosz' death was caused by his depression and therefore was found to be due to Nazi persecution.

112.    On July 31, 1960, Eva Grosz died in Berlin.

113.     In 1961, the German compensation office issued decisions awarding damages for the loss of Grosz' life due to Nazi persecution and for the loss of Grosz' professional advancement. (Exhibit 25).

114.     In 1971, the City of Berlin compensated the Heirs for the loss of Grosz' paintings burned by the Nazis and other lost property. The Heirs were unable to specify which artworks were lost.

## Jentsch's Discovery That The Paintings Were Stolen

115.     In the 1980s, art historian Ralph Jentsch began researching the whereabouts and the provenance of the artworks created by Grosz.

116.     In 2002, Ralph Jentsch discovered evidence indicating that the Paintings were stolen from Grosz.

117.     On November 24, 2003, Ralph Jentsch, on behalf of the Heirs, requested MoMA return the Paintings to the Heirs. (Exhibit 26).

118.     On April 12, 2006, MoMA refused to return the Paintings. (Exhibit 27).

## PLAINTIFFS' CLAIMS
### Allegations Common to the Paintings

119.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

## Under German Law, the Paintings were Lost Due to Nazi Persecution

120.     After the end of World War II, Germany passed laws governing the restitution of property lost under Nazi rule. These laws are valid today.

121.     For instance, Military Government Law No. 59, implemented in November 1947, addressed persons who were wrongfully deprived of tangible and intangible property for reasons of race, religion, nationality, ideology, or political opposition to the Nazis (Article 1).

122.     Article 3 established a presumption of confiscation involving transfers or relinquishment of property of persons persecuted during the Nazi period, unless the transfer or relinquishment was for fair value and would have otherwise occurred in the absence of Nazi rule. Gratuitous transfers were presumed to be ineffective.  (Article 4).

123.     Under contemporary German restitution laws, property left behind in Germany due to Nazi persecution is "lost property" subject to restitution.  (Vermögensgesetz § 1 VI). (Brettholle/Schülke in R/R/B, Vermögen in der ehemaligen DDR, Teil 3 § 1 Rn. 137).  German law therefore deems that no one can obtain good title to lost or stolen property even if the recipient acts in good faith.  German Civil Code § 935 BGB.

124.     Grosz was an enemy of the state and could not return to Germany once the Nazis seized power.  Grosz was specifically found by German compensation courts to have been persecuted by the Nazis, to have lost his property, lost his profession, suffered severe physical damages, and eventually lost his life – all directly due to Nazi persecution.  (*See* Exhibit 25).

125.     Under German law, the Paintings are "lost property" because Grosz was persecuted.  The act of leaving the Paintings behind in Germany is an involuntary relinquishment due to Nazi persecution.  As such, no one can obtain title to the Paintings under German law.

126.     Under German law, payment of  compensation claims by the German government does not preclude a property owner from later recovering lost or stolen property.

### Galerie Flechtheim Never Owned the Paintings

127.     Grosz was the creator and owner of the Paintings and consigned the Paintings to Galerie Flechtheim in 1928 and 1929.  The consignment agreement, if any, was abrogated by Nazi decrees and persecution.  Even if a valid consignment agreement were in place, which the Heirs dispute, such consignment would not entitle the consignee to transfer title to the consigned

25

property without good and valid consideration. A consignee has no authority to gift or bequest the property to a third party, and under these circumstances has no authority to transfer valid title.

### *Herrmann-Neisse with Cognac*

128.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

129.    Following Grosz' delivery of *Herrmann-Neisse with Cognac* to Galerie Flechtheim in Berlin, it was exhibited in 1928 at the Prussian Academy of Arts, MoMA in 1931, and at the Palais des Beaux Arts in Brussels in 1932. MoMA's exhibition catalog indicates that it was on loan from Galerie Flechtheim. (*See* Exhibit 2). MoMA's catalog clearly distinguishes artworks on loan from Flechtheim's private collection. Thus, at the time MoMA acquired *Herrmann-Neisse with Cognac* in 1952, MoMA had actual notice of its suspect provenance because MoMA knew it had been held by Flechtheim on consignment and Flechtheim and Grosz had each been persecuted by the Nazis and fled Germany.

### The *Herrmann-Neisse with Cognac* Was Not Pledged, Transferred or Sold by Grosz

130.    The extensive list of Grosz' oil paintings located at Galerie Billiet did not include the *Herrmann-Neisse with Cognac*. Indeed, Grosz' watercolors and oil paintings, part of the consignment inventory of Galerie Flechtheim at the time of liquidation, were excluded from the liquidation of the Berlin gallery, since title remained with Grosz. An April 15, 1934 Flechtheim letter indicates that the liquidation had already been completed and creditors paid 20% of their claims. (*See* Exhibit 16)

131.    *Herrmann-Neisse with Cognac's* title could not possibly have been transferred to Galerie Flechtheim as an offset against debt, as the body of Grosz' artworks were sent to London

and Paris.  Liquidation of Flechtheim's Düsseldorf and Berlin galleries was completed prior to April 15, 1934.

### *Herrmann-Neisse with Cognac* Went Missing: It May Have Remained With Flechtheim After He Fled Germany

132.    Alfred Flechtheim was persecuted by the Nazis and left Germany in October 1933, yet continued to act as a consignee for certain Grosz works as evidenced by his delivery of certain of Grosz' oil paintings to Paris and Grosz' watercolors to London.

133.    There is no evidence in business records that Flechtheim possessed *Herrmann-Neisse with Cognac* after leaving Berlin.

134.    *Herrmann-Neisse with Cognac* was not sent to Paris with the other oil paintings. *Herrmann-Neisse with Cognac* was clearly not in Flechtheim's inventory while he lived in Paris or London.

135.    Since Galerie Flechtheim was undergoing liquidation after Flechtheim fled Germany, whoever had possessed *Herrmann-Neisse with Cognac* was either a thief or  a servant-in-possession under German law.  (*See* German Civil Code § 855 BGB).  A servant-in-possession is a person that merely holds property for the actual owner and cannot dispose of property absent authority given by the owner.  If the servant-in-possession transfers property without authority it is deemed lost or stolen property even if the recipient acts in good faith. German Civil Code § 935 BGB.  A spouse holding property in connection with the other spouse's business is a servant-in-possession under § 855 BGB.

Following Flechtheim's death, title to *Herrmann-Neisse with Cognac* could not have been transferred without Grosz' authorization.

**MoMA's Provenance for *Herrmann-Neisse with Cognac* is a Factual and Legal Impossibility**

136.    MoMA's provenance of *Herrmann-Neisse with Cognac* indicates that it was owned by Galerie Flechtheim prior to Charlotte Weidler, who allegedly obtained the painting as an "inheritance" in April 1937 – three years after Galerie Flechtheim was liquidated and two months after it was officially dissolved.  This was one month after Flechtheim died.

137.    *Herrmann-Neisse with Cognac* was delivered to Galerie Flechtheim on consignment in 1928.  (*See* Exhibit 1).  The painting was not subject to a security interest, or it otherwise would have been sent to Galerie Billiet in Paris.  (*See* Exhibit 7).  Even assuming a valid consignment, which the Heirs dispute, the consignee is without authority to gift an artwork to a third party, let alone make a direct gift to himself as consignee – a consignee that was liquidated by April 1934 and dissolved by February 1937.

138.    There is no evidence that Grosz ever pledged *Herrmann-Neisse with Cognac* as security for a debt.  Indeed, there is no evidence that title to the painting was transferred by Grosz to anyone.  Grosz in letters to his brother-in-law and to his friend revealed that the painting was "stolen."  Therefore, it is factually impossible that the painting's provenance ever included ownership by Galerie Flechtheim, or was ever owned by Alfred Flechtheim personally.

139.    Charlotte Weidler's representation that *Herrmann-Neisse with Cognac* was given to her by Galerie Flechtheim (as an "inheritance") was factually impossible, as the gallery was liquidated years before the purported transfer.  Even if Flechtheim indeed held ownership of the painting he would have had to indicate his donative intent to give the painting to Weidler during his lifetime, as the entirety of his estate was left by will to his nephew, Heinz Hulisch.  Even assuming *arguendo* Flechtheim's title, in the absence of written evidence of an inter-vivos gift and actual delivery to Weidler, any purported gift must fail.

**The *Herrmann-Neisse with Cognac* was Confiscated by the Nazis**

140.    The Nazis confiscated all artworks Grosz left in Germany, including the

*Herrmann-Neisse with Cognac*. Even if the painting was in Charlotte Weidler's possession, it

became state property upon confiscation. (*See* Exhibit 21).

141.    Confiscation of the painting occurred upon publication of the March 8, 1938 order

in the Reichsanzeiger (the official bulletin of the Third Reich). From this point on it would have

been impossible for Grosz to reclaim the painting or for Weidler to pass title.

**MoMA Did Not Obtain Valid Title**

142.    New York courts have found that title to property left behind and lost due to Nazi

persecution cannot be conveyed as against the rightful owners.

143.    Grosz involuntarily left *Herrmann-Neisse with Cognac* behind in Germany when

he left in January 1933 as a result of Nazi persecution.

144.    Under New York law, no one who purchases from a thief, or any subsequent

purchasers from the thief, can acquire good title. This also applies to property that was lost due

to Nazi persecution.

145.    Accordingly, MoMA could not acquire good title from Weidler because she never

had title, as the *Herrmann-Neisse with Cognac* was lost due to Nazi persecution. Under German

law, title to lost property cannot pass even if the recipient acts in good faith.

***Self-Portrait with Model***

146.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

147.    At the time *Self-Portrait with Model* was consigned by Grosz to Galerie

Flechtheim in 1929, a written consignment existed between Grosz and Galerie Flechtheim. Over

time, the consignment agreement, if any, was terminated.

148.    Within months following Grosz' flight from Germany and the seizure of governmental power by the Nazis, Flechtheim, a Jewish art dealer in "degenerate" art, had no choice than to liquidate his galleries in Düsseldorf and Berlin and similarly flee from Nazi persecution.

149.    Flechtheim arranged to have Grosz' paintings and drawings moved from Germany to Paris and London prior to the liquidation of Galerie Alfred Flechtheim G.m.b.H. Among the Grosz paintings sent to Paris to the Galerie Billiet was the *Self-Portrait with Model*. (*See* Exhibit 7).

150.    Flechtheim's arrangement with the Paris and London galleries regarding Grosz' artworks involved a sharing of proceeds: 25% to the gallery, 25% to Alfred Flechtheim, and 50% to Grosz. Grosz' artworks failed to sell in the Paris and London art markets. Indeed, Flechtheim asked Grosz to send money to him from New York because he was struggling to survive. (*See* Exhibit 7).

151.    In 1936 Flechtheim sent several of Grosz' paintings from Paris, including *Self-Portrait with Model,* to the Kunstzaal van Lier in Amsterdam for a sales exhibition during July and August 1936. (Exhibit 11). The sales exhibition was unsuccessful.

152.    On March 11, 1937, Alfred Flechtheim died in London from blood poisoning. At Flechtheim's death, any consignment or personal services agreement with Grosz terminated by law.

153.    At Flechtheim's death, George Grosz retained all right, title and interest to *Self-Portrait with Model.*

154.    Grosz never abandoned *Self-Portrait with Model.*

155.   The purported "auction" was an unauthorized sham at which Carel van Lier purchased *Self-Portrait with Model* (Lot 278) for 16 Dutch Guilders (US$10.16), as well as other Grosz artworks. The amount paid by van Lier for *Self-Portrait with Model* was derisory. The *Self-Portrait with Model* was resold by van Lier two months later on April 9, 1938 at the price of 150 Dutch Guilders (US$95.25), or a profit of over 900%.

156.   Even if Flechtheim sent Grosz' artworks to van Lier voluntarily, Kunstzaal van Lier's consignment authority, if any, terminated upon Alfred Flechtheim's death. Without Grosz' consent, van Lier had no authority to include Grosz' artworks in a Dutch auction. Van Lier intentionally sold and bought the *Self-Portrait with Model* in order to sanitize the painting's provenance and establish the fiction that he held good title upon its subsequent transfer to Leo Lionni.

157.   When Flechtheim died, his personal services agreement, if any, with Grosz automatically terminated. Grosz maintained ownership rights in the *Self-Portrait with Model*. Any purported subordinate consignment agreement between Flechtheim and Kunstzaal van Lier would have also automatically terminated. Van Lier's possession of any artworks at such time would have been held by van Lier in trust for the benefit of Grosz. When van Lier without authority and without consent from Grosz included the Grosz artworks in an auction, van Lier stole the artworks. Since the purported original consignor was a dead, famous, persecuted Jew selling works famously declared "degenerate" and confiscated by the Nazis, van Lier had no apparent authority to transfer good title to Leo Lionni or MoMA.

158.   The MoMA acquired *Self-Portrait with Model* through a source with void title. Accordingly, title resides in the Heirs.

### *Republican Automatons*

159.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

160.    At Flechtheim's death, George Grosz retained all right, title and interest to *Republican Automatons*.

161.    Grosz never abandoned *Republican Automatons*.

162.    The MoMA acquired *Republican Automatons* through a source with void title. Accordingly, title resides in the Heirs.

## MoMA'S  UNCLEAN HANDS AND INEQUITABLE CONDUCT

163.    MoMA's possession of the Paintings violates its self-imposed ethical standards to not hold in its collection artworks tainted by Nazi persecution.

164.    MoMA does not have valid title to the Paintings.  According to the International Council of Museums ("ICOM") Code of Ethics for Museums, valid title is an "indisputable right to ownership of property, supported by full provenance of the item from discovery or production."

165.    When MoMA acquired the Paintings it did nothing to research the Paintings' provenance, even though it knew Grosz, Flechtheim, and others were persecuted by the Nazis and lost property and artworks during the Nazi-era.

166.    At all relevant times, MoMA knew or should have known that Valentin and Weidler were thieves trafficking in stolen artworks.

167.    Grosz never conveyed title in *Herrmann-Neisse with Cognac* to Galerie Flechtheim, and Flechtheim had no authority to convey title to Weidler.

168.    Following Flechtheim's death, Van Lier lacked authority and Grosz' consent to sell and purchase *Self-Portrait with Model* or *Republican Automatons* at auction.  The Paintings

were owned by Grosz who involuntarily lost control of them, and other possessions, when he had to immediately flee Germany due to Nazi persecution.

## MoMA's Retention or Possession Is Inequitable

169.    Following MoMA's acquisition of the Paintings, Grosz was incapacitated and such incapacity was found by German compensation authorities to be directly related to his persecution by the Nazis who destroyed his art and professional life.  The losses Grosz suffered due to Nazi persecution caused severe depression and alcoholism as determined by the German authorities.  (*See* Exhibit 25).  Such depression was not unique to Grosz.  In reaction to Nazi policies and in particular the Nazi rejection of art as "degenerate", Ernst Ludwig Kirchner committed suicide in 1939.  The same circumstances similarly lead to the suicides of Bruno Gimpel in 1943 and Joachim Karsch in 1945.

170.    After Grosz' death, his sons took over the administration of his matters.  Due to his depression, Grosz was unable to speak to his sons about what had happened to him in Germany and the artworks that had been lost or left behind.

171.    When Grosz died his sons had no information or documentation regarding his lost artworks.  They contacted different art dealers to help them reconstruct Grosz' body of work.  Finally, art historian Ralph Jentsch started researching the whereabouts of Grosz' artworks in the 1980s.  Only in 2003, after almost 20 years of research, Jentsch uncovered the history of the Paintings and the circumstances under which they were lost.

### FIRST CLAIM
### (Declaratory Judgment - Title)

149.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

150.    At the time of the commencement of this action and at all times hereinafter mentioned, Plaintiffs were and are the owners and entitled to immediate possession of the Paintings.

151.    This case involves an actual controversy over title of the Paintings.

152.    Plaintiffs are the heirs of Grosz.

153.    Pursuant to 28 U.S.C. §§2201-2202 of the Federal Rules of Civil Procedure, plaintiffs are entitled to be declared the owners of the Paintings located in this judicial district.

**SECOND CLAIM**
**(Conversion - Damages and attorneys' fees for wrongful withholding and interfering with possession of the Paintings)**

154.  Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

155.  Plaintiffs demanded the return of the Paintings.

156.  MoMA wrongfully refused to return the Paintings.

157.    MoMA's wrongful retention caused Plaintiffs to expend monies and attorney's fees in pursuing the Paintings.  By refusing to return the Paintings to the true owners, MoMA wrongfully interfered with Plaintiffs' rightful possession and caused damages in the amount of the fair market value of the Paintings together with the cost and reasonable attorneys fees expended in their recovery.

**THIRD CLAIM**
**(Replevin)**

158.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

159.    At the time of the commencement of this action and at all times hereafter mentioned, Plaintiffs were and are the owners of and entitled to immediate possession of the Paintings.

160.    MoMA is in possession of the Paintings.

34

161.    MoMA's detention of the Paintings is wrongful because the Paintings rightfully belong to Plaintiffs.

162.    Prior to commencement of this action, Plaintiffs duly demanded possession of the Paintings, but MoMA has refused and still refuses to deliver the Paintings to Plaintiffs.

163.    By reason of such wrongful detention of the paintings by MoMA, Plaintiffs are entitle to an order directing that the Paintings be returned to plaintiffs, or in the alternative, awarding damages in an amount to be determined by the court, together with costs and reasonable attorneys' fees.

## FOURTH CLAIM:
### (Constructive Trust)

(Recovery of proceeds flowing from and restitution of the value of stolen artworks held and concealed by Defendant)

164.    Counterclaim Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

165.    Upon information and belief, MoMA took the Paintings into its custody with under a circumstance that would render it equitable for it to return such property to its rightful owner upon due demand.

166.    Such custody, and MoMA's tax-exempt status as a custodian of the public trust, created a fiduciary relationship.

167.    It is just and equitable that the court impress a constructive trust to attach to the res from the time it entered MoMA's possession.

168.    Each transferee took possession of such unique chattels under circumstances in which such transferee knew Grosz had been despoiled by the Nazis, making it just and fair for the court to apply an equitable lien under the principles of equity.

169.    Applying the doctrine of equitable servitudes to such unique chattels wrongfully obtained by transferees is fair and just under the circumstances.

170.    MoMA would be unjustly enriched if permitted to retain these unique chattels or any of the benefits accruing therefrom.

171.    Accordingly, each and every financial emolument accruing to MoMA during the period of the trust should be disgorged and paid over together with prejudgment interest.

172.    Plaintiffs have no adequate remedy at law.

173.    Permitting the Defendant to retain property belonging to the Heirs is unfair and unjust and in light of the totality of the circumstances warrants imposing a constructive trust under equitable principles of New York law.

174.    Plaintiffs pray for an order impressing a constructive trust upon all holders and purchasers of works stolen from the estate of Grosz and their agents, past and present and ordering that all chattels be returned to the rightful Heirs and that any income, commissions or other benefits be disgorged and paid to Plaintiffs.

**WHEREFORE,** Plaintiffs respectfully request that the Court:

1. Declare that Plaintiffs are the rightful owners of three paintings by George Grosz titled *Herrmann-Neisse with Cognac, Self-Portrait with Model* and *Republican Automatons* and order MoMA to deliver such paintings into the possession of the Plaintiffs;

2. Direct Defendant to disgorge profits and revenues received from possession of the Paintings;

3. Award Plaintiffs reasonable attorneys' fees and costs pursuant to Fed. R. Civ. P. 54(d).17;

4. Grant such other and further relief as the Court deems just and proper.

36

Dated: New York, New York
      May 28, 2009

Respectfully submitted,

**DUNNINGTON BARTHOLOW & MILLER LLP**

By:

Raymond J. Dowd (RD-7508)
1359 Broadway, Suite 600
New York, New York 10018
Tel: (212) 682-8811
Fax: (212) 661-7769

**ROWLAND & PETROFF**

David J. Rowland (DR- 2785)
Philip J. Smith (PS-0680)
Two Park Avenue 19th Floor
New York, New York 10016
Tel: (212) 685-5509
Fax: (212) 685-8862

Attorneys for Plaintiffs
Martin Grosz and Lilian Grosz

## VERIFICATION

Lilian Grosz duly certifies that she is a Plaintiff in this action, has read the contents of the attached First Amended Complaint, is familiar with the contents therein, and certifies that the contents of the Verified Complaint are true to the best of her knowledge, information and belief.


Dated: May 28, 2009
       Princeton, NJ


                                 _____
                                       Lilian Grosz