USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __6/10__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————— x

MARTIN GROSZ and LILIAN GROSZ,
                              Plaintiffs,

                                                      09 Civ. 3706 (CM) (THK)

-against-


THE MUSEUM OF MODERN ART,
                              Defendant,

HERRMANN-NEISSE WITH COGNAC,
SELF-PORTRAIT WITH MODEL
and REPUBLICAN AUTOMATONS,
Three Paintings by Grosz,
                         Defendants-in-rem.

——————————————————————————— x


### DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

McMahon, J.:

## **INTRODUCTION**

George Grosz was an early twentieth-century German artist and prominent member of a movement known as the Berlin Dada and New Objectivity Group. His artwork, consonant with the larger movement, was strongly anti-totalitarian and therefore anti-Nazi. (See First Am. Compl. ("Complaint"), May 28, 2009, ¶¶ 2-3.)

Grosz's son and daughter-in-law, Martin and Lilian Grosz (plaintiffs in this lawsuit), explain that, although Grosz was not Jewish, his work "typified" the kind of "'degenerate' art Hitler hated." (Id. ¶ 3.) As a result, Grosz was forced to flee Germany in the wake of Hitler's ascension to Chancellor in 1933. (Id. ¶¶ 3, 45-46.) After his departure, the Third Reich branded him an "enemy of the state" (id. ¶ 124), and in March

1938, the government rendered him "stateless," revoking his citizenship and confiscating what remained of his German assets (id. ¶ 102).

This action relates to the ownership of three of Grosz's caricatural paintings, which are alleged to have fallen prey to Nazi looting (albeit indirectly) in the years between Grosz's emigration from Germany in 1933 and the German government's confiscation of his assets in 1938. Specifically, the plaintiffs allege that the Museum of Modern Art ("MoMA") obtained and now wrongfully holds: *Hermann-Neisse with Cognac* ("*Poet*"), *Self-Portrait with Model* ("*Self-Portrait*"), and *Republican Automatons* ("*Automatons*") (collectively, the "Paintings"). (Id. ¶¶ 11-15.) The plaintiffs seek declaration of title and replevin for each, as well as damages for unlawful dominion and control over the artworks, attorneys' fees, costs, and disgorgement of profits and revenues received by MoMA from possession of the Paintings. (Id. ¶¶ 25, 149-74 (claims).)[1]

Because this action is barred by the statute of limitations, the defendant's motion to dismiss is granted.

## **DISCUSSION**

### **I.    Standard of Review**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See Cargo Partner AG v.

---

[1] Plaintiffs' Complaint includes two sets of paragraphs numbered 149-171, presumably because, when they amended their initial pleading, they failed to adjust the numbering of the paragraphs. For ease of reference, the Court will use the plaintiffs' numbering but will indicate parenthetically when the numbering refers to the "claims" portion of plaintiffs' complaint (located at pages 33-36).

2

Albatrans, Inc., 352 F.3d 41, 44 (2d Cir. 2003); see also Roth v. Jennings, 489 F.3d 499,

510 (2d Cir. 2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual

matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129

S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "While a complaint

attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations,

a plaintiff's obligation to provide the grounds of his entitlement to relief requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." Twombly, 550 U.S. at 555 (internal quotations, citations, and

alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged

[its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must

be dismissed." Id. at 570; Iqbal, 129 S. Ct. at 1950-51.

In deciding a motion to dismiss, this Court may consider the full text of

documents that are quoted in the complaint or documents that the plaintiff either

possessed, or knew about and relied upon in bringing the suit. Rothman v. Gregor, 220

F.3d 81, 88-89 (2d Cir. 2000); San Leandro Emergency Med. Group Profit Sharing Plan

v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996).

## II.    Timeliness

The lapse of a limitations period is an affirmative defense that a defendant must

plead and prove. Fed. R. Civ. P. 8(c)(1). However, a defendant may raise an affirmative

3

defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint. McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004) (affirmative defense of qualified immunity); see also 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1226 (3d ed. 2004) ("[T]he current trend in the cases is to allow [the statute of limitations defense] to be raised by a motion to dismiss under Rule 12(b)(6) when the defect appears on the face of the complaint."). Timeliness is "material when testing the sufficiency of a pleading." Fed. R. Civ. P. 9(f).

## III.    Background

The Complaint alleges that George Grosz created the Paintings at various dates between 1920 and 1929. It appears undisputed that he created *Automatons* first, in 1920 (id. ¶ 15), followed by *Poet*, which he painted in 1927 or 1928 (id. ¶ 38 (1927); id. ¶ 11, (1928)). *Self-Portrait* is alleged to have been created in either 1928 or 1929. (Id. ¶ 39 (1928); id. ¶ 13 (1929).)

The plaintiffs contend that each of the Paintings was consigned at one time or another to Alfred Flechtheim, Grosz's art dealer (id. ¶¶ 38-39), and that after Flechtheim's death in 1937, the three Paintings fell prey to a network of unscrupulous art professionals, who took advantage of the political climate of the time to divest Grosz of his ownership. First, they allege that within one month of the dealer's death, an opportunistic art historian (Charlotte Weidler) stole *Poet*, which she is alleged to have hidden in Germany until 1952, when she sold it to MoMA. Less than one year later, in February 1938, a plundering Dutch art dealer (Carel van Lier) stole and then purported to auction off *Self-Portrait* and *Automatons*. The plaintiffs allege that the auction was a "sham," designed to obfuscate the true nature of van Lier's operations—laundering Nazi-

4

looted art—as evidenced by the fact that van Lier "purchased" both pieces himself at suspiciously below market prices. Shortly thereafter, the Dutch dealer sold the pieces to private collectors for a handsome profit.

*Automatons* eventually made its way to Canada; MoMA purchased it from its owner in 1946. (Id. ¶¶ 58-59.) Eight years later, after a failed attempt to sell *Self-Portrait*, Leo Lionni, then-Art Director for *Fortune*, gifted the piece to the museum in 1954. (Id. ¶ 56.)

The precise path the Paintings allegedly took on their journey from Berlin to MoMA, and the role of each of the alleged middlemen, is chronicled in detail below.

A.    Grosz's Art Dealer: Alfred Flechtheim

George Grosz's art dealer was Alfred Flechtheim, who owned and operated Galerie Flechtheim (the "Galerie"), which had outposts in both Berlin and Dusseldorf. (Id. ¶ 47.) Grosz's first art exhibition took place at Flechtheim's Berlin gallery in the early 1920s. (Id. ¶ 37.) The Complaint does not specify which works were displayed, but states that the show was such a resounding success that, by 1925, Galerie Flechtheim had entered into an agreement with Grosz to be his exclusive dealer. (Id.) The terms of the agreement provided that Grosz would receive monthly payments of 300 to 800 Reichmarks ("RM") in exchange for consigning his work solely to the Galerie. (See id.)

Pursuant to this agreement, *Poet* was consigned to Flechtheim in 1928 as "Kleiner Portrait Max Hermann (mit cognac flasche)." It appears to have been the first of the Paintings Grosz consigned to the Galerie. (Id. ¶¶ 38, 137 & Ex. 1.) One year later, Grosz consigned *Self-Portrait*, known then as "Das Modell," to Flechtheim. (Id. ¶ 39 & Ex. 1.)

The Complaint does not allege when *Automatons* might have been consigned to the Galerie.

Some documents attached to the Complaint suggest that Grosz offered Flechtheim one or more of his artworks as "security" for a debt Grosz owed to the dealer. For example, a letter from Flechtheim to Grosz written in April 1934 refers to "watercolors which you sent me as security" as well as "oil pictures, which you also sent me as security." (Id. Ex. 7.) A subsequent letter from Flechtheim's liquidator to Grosz reminds the artist that he "still owe[s] the gallery RM 16,255." (Id. Ex. 6.) [2]

Flectheim apparently went out of business at some point. The plaintiffs speculate that his liquidation was the result of Nazi coercion, but that theory is contradicted by certain documents they have attached to their Complaint, including letters between Grosz and Flechtheim. These documents suggest that Flechtheim's liquidation was precipitated by his acute financial troubles, going back as far as 1931, before the Nazis came to power. (See id. Ex. 3.) A letter from Flechtheim to Grosz dated April 15, 1934, explains that the dealer's "German galleries [had] totally collapsed financially," that it "was only with great effort . . . that [his] liquidator succeeded in preventing bankruptcy," and that he was selling "all [his] pictures . . . for the account of creditors in London" where he had spent 2 months "and hope[d] to get [his] feet on the ground." (Id. Ex. 7.) By the time he wrote this letter to Grosz, Flechtheim's Berlin gallery had already been liquidated, though

---

[2] The plaintiffs dispute the validity of the debt—they suggest that the Nazis coerced Flechtheim into liquidating his holdings in exchange for his safe departure from the country, the debt having been fabricated as part of the Nazi scheme. (Id. ¶ 47.) In the alternative, they argue that at least *Poet* "could not possibly have been transferred as an offset" against any alleged debt. (Id. ¶¶ 131, 137-38.)

it was not "officially dissolved and removed from Berlin's commercial registry" until nearly three years later, on February 20, 1937. (Id. ¶¶ 52, 137.)

Notwithstanding his financial missteps, Flechtheim continued to consign Grosz's works on an ad hoc basis until his death in London in 1937. (See, e.g., id. ¶¶ 16, 48, 149 & Ex. 7.) At the time of the dealer's death, the Complaint alleges that Flechtheim had consigned *Self-Portrait* to Kunstzaal van Lier in Amsterdam and *Automatons* to the Mayor Gallery in London. (See id. ¶ 51 (*Self-Portrait*); id. ¶ 57 (*Automatons*).) The Complaint further alleges that, while *Poet* had been consigned from time to time— including one consignment in 1932 when it was displayed at Palais des Beaux Arts in Brussels—by 1937 the painting was back in Berlin, unconsigned. (Cf. id. ¶ 55.)

B.    Amsterdam Art Dealer Carel van Lier

Carel van Lier is alleged to have been a cunning Dutch art dealer who ran Kunstzaal van Lier in Amsterdam, where *Self-Portrait* was consigned in 1936 (and where it remained upon Flechtheim's death the following year). (Id. ¶ 51.) In early 1938, van Lier arranged to have *Automatons* transferred to his Kunstzaal from the Mayor Gallery in London, where Flechtheim had consigned it in 1934. (Id. ¶¶ 16, 57.) The Complaint does not allege who authorized the transfer.

Later that year, van Lier, whom the plaintiffs accuse of having "lacked any moral compass," allegedly arranged a "sham" auction at the Mak van Waay auction house in Holland to launder artworks stolen by the Nazis. (See id. ¶ 57.) At that "auction," van Lier purportedly purchased a collection of Grosz's pieces that he himself had "put up for auction," including *Self-Portrait*, which the plaintiffs suggest he bought at a deeply discounted price. (Id. ¶ 56 (16 guilder for *Self-Portrait*).) A couple of months later, he

7

resold the piece for a handsome profit to Leo Lionni, who was then the Art Director of *Fortune* magazine.  (Id.)

Meanwhile, *Automatons* was bundled with three other watercolors and one drawing, which were collectively sold at the same auction for 25 guilders.  (Id. ¶ 57.)  An individual known simply as "Brant" or "Brandt" (both names appear in the Complaint) is alleged to have been the purchaser.  (Id. ¶¶ 16, 57.)  Brandt then sold the work to Dr. Herbert Tannenbaum in 1939 for an unknown amount, and Dr. Tannenbaum soon thereafter sold the piece to Dr. William Landman of Toronto, from whom MoMA would ultimately purchase the piece in 1946.  (Id. ¶¶ 58-59.)

C.    Art Historian Charlotte Weidler

While van Lier was auctioning off *Self-Portrait* and *Automatons*, Charlotte Weidler is alleged to have been busy embezzling the third of the three Paintings (*Poet*). Weidler was a German art dealer, critic and curator for the Carnegie Institute in Pittsburgh.  (Id. ¶ 74.)  One month after Flechtheim's death in April 1937, in a letter to a fellow art historian, Weidler claimed that she had "inherited" *Poet* from the late dealer. (Id. ¶¶ 12, 74-75 & Ex. 16.)  The plaintiffs suggest that Weidler was actually an international art thief and/or Nazi agent, who wrongfully and willfully converted the painting.  (Id. ¶¶ 76, 12.)

In support of their theory, the plaintiffs recount the fate of the art collection of one Paul Westheim.  Westheim was a modernist art collector who entrusted his portfolio to Weidler shortly before he fled Berlin.  (Id. ¶ 79.)  The Complaint says nothing about the precise date Westheim left Germany, but it appears to have been some time in the 1920s, and in any event before the Nazis came to power in 1933, because Weidler attempted to

8

sell Westheim's collection to MoMA in either 1929 or 1930 (with no authorization to do so).  (Id. ¶ 80 & Ex. 20.)

The plaintiffs further allege that Weidler would come to New York in 1939 as a Nazi agent.  (See id. ¶¶ 77-78.)  The plaintiffs back their allegation with a handful of letters (all of them rank hearsay) between an assistant director of the Freer Gallery of Art in Washington, D.C., and a trustee of the Carnegie Institute, in which the two speculate that Weidler might be a Nazi—though, their suspicions, as they acknowledge, lacked a certain "logical" basis.  (Id. ¶ 78 & Ex. 17.)  For example, one of the letters explains:

> Not for one minute do I want to persuade you that Dr. Weidler is in truth what she claims to be—anti-Nazi.  I, personally, have a hunch that she is not . . . but there is nothing I can offer in proof.  Nothing at all; but at times I am blessed with a feminine intuition and you know that often it is as certain as it is without logic.

(Id. Ex. 17.)

Whether or not Weidler may was an agent of the Third Reich, she did contact MoMA in 1950 in an attempt to sell *Poet* to the museum.  (Id. ¶ 87.)  Unable to persuade MoMA to purchase the piece, Weidler then contacted Alfred Flechtheim's one-time assistant, Curt Valentin, to help her liquidate the work.  (Id. ¶ 90.)  In 1952, Valentin was successful in brokering a deal with MoMA for *Poet*, which became museum property on April 10 of that year.  (Id.)

The Complaint does not explain how Weidler was acquainted with Valentin, although the plaintiffs do allege that Valentin, like Weidler, was a "Nazi agent" who set up the Buchholz Gallery in New York, through which the deal with MoMA over *Poet* was brokered, in order "to sell Nazi-looted artworks."  (Id. ¶ 60 Heading)

9

### D.    MoMA's Director: Alfred Barr

The man who purchased *Poet* on MoMA's behalf was Afred Barr, the long-time director of the museum.  (Id. ¶ 90.)  The plaintiffs allege that, when Weidler approached MoMA, "Barr clearly knew that Weidler was trying to sell a stolen Grosz to him."  (Id. ¶ 88.)  In support of their assertion, the plaintiffs offer three circumstantial allegations.

First, they point out that thirteen years before he purchased *Poet* from Weidler, Barr may have purchased Nazi-looted art through Alfred Flechtheim's former assistant, Curt Valentin.  (See id. ¶¶ 65-67 & Ex. 13.)  Specifically, the Complaint alleges that Barr used Valentin as his agent in 1939 to purchase five pieces (none by Grosz) at an auction in Lucerne, Switzerland—works that had been "part of a monstrous Nazi seizure of all modern works from German museums and private owners during the previous year."  (Id. Ex. 14.)

Second, the Complaint alleges that MoMA never contacted the artist to sign or restore the painting, even though the museum knew that Grosz lived in New York.  (Id. ¶ 91.)

Third, the Complaint argues that neither Barr nor anyone else at MoMA did any research into the painting's ownership or provenance before its purchase, intimating that Barr sought actively to avoid being confronted with what he knew to be the painting's tainted history.  (Id.)

In their response to defendants' motion to dismiss, plaintiffs disavow any suggestion that these allegations are intended to allege that MoMA purchased the painting in bad faith.  Stating that "the words 'bad faith' do not appear in the Complaint" (and indeed those precise words do not appear in the pleading), they contend that the

10

Complaint alleges "only that MoMA was on notice of facts warranting investigation because it knew the Paintings had been held on consignment by Flechtheim, a Jew persecuted by the Nazis." (Pls. Mem. of Law in Opp. to Mot. to Dismiss ("MTD Opp."), June 25, 2009, at 15-16 (citation omitted).) The reason for this wholly unconvincing change of position will become apparent when the Court discusses the peculiarities statute of limitations relating to conversion and how that affects the timeliness of plaintiffs' claim to *Poet*. See infra Part IV.

    E.    Grosz Sees *Poet* in MoMA But Does Not Try to Reclaim the Painting

    The artist himself saw *Poet* on display at the museum in 1953, barely a year after Barr had purchased it from Weidler. At that time, the Grosz wrote to his brother-in-law: "Modern Museum exhibits a painting stolen from me (I am powerless against that) they bought it from someone, who stole it." (Compl. ¶ 105.) In a second letter dated January 9, 1953, Grosz wrote: 'Modern Museum bought a painting that was stolen from me... (one cannot do anything) old affair.' (Id.) Sadly, the artist would die six and a half years later, on July 6, 1959; during those six and one half years he never contacted anyone at MoMA to seek restitution of the painting.

    F.    The Instant Action

    On November 24, 2003, forty-four years after Grosz's death, Ralph Jentsch, "managing director of the George Grosz Estate and author of [the artist's] catalogue raisonne," finally asked MoMA to return *Poet* to the estate—along with *Self-Portrait* and *Automatons*, which he also thought had been wrongfully taken from Grosz during his lifetime. (Id. ¶ 117 & Ex. 26.)

Plaintiffs assert that this demand was not refused MoMA until the museum sent

them a letter on April 12, 2006. (MTD Opp. at 9.) They filed their Complaint, which

included, inter alia, claims for conversion, replevin, declaratory judgment and

"constructive trust" on April 10, 2009—almost three years to the day after the letter on

which plaintiffs rely. (Id. ¶¶ 149-174 (claims).)

On June 4, 2009, defendants moved to dismiss the Complaint as time barred,

under a variety of theories

## IV.    The Statute of Limitations

New York Civil Practice Law and Rules ("CPLR") provides that "an action to

recover a chattel or damages for the taking or detaining of a chattel [replevin or

conversion] . . . must be commenced within three years," CPLR § 214(3), computed from

"the time the cause of action accrued to the time the claim is interposed," CPLR § 203(a).

While a claim for declaratory judgment without a prescribed limitations period usually

enjoys a six-year limitations period under CPLR 213(1), in cases like this where a claim

"could have been made in a form other than an action for a declaratory judgment [i.e., an

action for conversion or replevin] and the limitations period for an action in that form has

already expired, the time for asserting the claim cannot be extended through the simple

expedient of denominating the action one for declaratory relief." New York City Health

& Hospitals Corp. v. McBarnette, 84 N.Y.2d 194, 201 (1994). Finally, it is settled law

that where, as here, both "a legal and an equitable remedy exists as to the same subject-

matter, the latter is under the control of the same statutory bar as the former." Keys v.

Leopold, 241 N.Y. 189, 189 (1925) (action for accounting and breach of contract); accord

Norris v. Grosvenor Mktg Ltd., 803 F.2d 1281 (2d Cir. 1986). Accordingly, the three

12

year statute of limitations for conversion and replevin (CPLR § 214(3)) applies to all of the plaintiffs' claims.

The question before this Court is when that three years began to run.

A.    Accrual: New York's Demand and Refusal Rule

Under New York law, the statute of limitations for conversion and replevin automatically begins to run against a bad faith possessor on the date of the theft or bad faith acquisition—even if the true owner is unaware the chattel is missing. Close-Barzin v. Christie's, Inc., 51 A.D.3d 444, 444 (N.Y. App. Div. 1st Dep't 2008). By contrast, "An innocent purchaser of stolen goods becomes a wrongdoer only *after* refusing the owner's demand for their return." Kunstsammlungen Zu Weimar v. Elicofon, 678 F.2d 1150, 1161 (2d Cir. 1982) (citing cases, emphasis added). Therefore, a cause of action accrues against a bona fide purchaser when the purchaser refuses to return the property in question. Id. Dubbed the "demand-and-refusal rule," this axiom of New York law dates back to 1966, when the New York County Supreme Court became the first court in the country to address the statute of limitations issue in the context of an action to recover a stolen painting. See Menzel v. List, 49 Misc. 2d 300 (N.Y. Sup. Ct. 1966).

The plaintiff in Menzel sought to recover a piece by Marc Chagall that she and her late husband had been forced to leave behind when they fled Belgium after the Nazis occupied that country. Id. at 302. Shortly after their departure, the Nazis declared the piece to be "decadent Jewish art" and seized it for "safekeeping." Id. at 301. The piece resurfaced in Paris in 1955, when a New York art dealer purchased it and then promptly resold it. Id. at 303. The plaintiff had been diligently searching for the work since the

end of the war, but was unable to locate it until 1962. When the purchaser refused to return the painting, she filed suit. Id. at 301.

At trial, the defendant established that he was an innocent purchaser who had no notice that the painting had been stolen. He pleaded the statute of limitations as a defense, based on either (1) the lapse of time since 1941, when the plaintiff had first been divested of custody, or in the alternative, (2) the lapse of time since 1955, when he purchased the piece.

The court disagreed with his argument, holding instead that a cause of action for conversion or replevin accrues "against a person who lawfully comes by a chattel arises, not upon the stealing or the taking, but upon the defendant's refusal to convey the chattel upon demand." Id. at 304 (citing Cohen v. M. Keizer, Inc., 246 App. Div. 277 (1st Dep't 1936); Gillet v. Roberts, 57 N.Y. 28 (1874)). The court reasoned that until a demand is made and refused, an innocent purchaser's possession is neither wrongful nor unlawful. He should be "informed of the defect in his title and have an opportunity to deliver the property to the true owner, before he shall be made liable as a tortfeasor for a wrongful conversion." Gillet, 57 N.Y. at 34 (alterations omitted). Thus, the court concluded, Menzel was entitled to replevy her painting.

B.    Unreasonable Delay

Under the demand-and-refusal rule as set forth in Menzel, it appears that a person who knows where a missing item is could delay the accrual of an action against a good faith purchaser indefinitely simply by failing to make a demand. It is undisputed that Grosz knew where at least one of the works—*Poet*—was a half century before plaintiffs demanded its return. But Grosz never demanded the return of the work. Since plaintiffs

have no more right to *Poet* than Grosz would have had if he were still alive, MoMA

argues that Grosz's unreasonable delay caused the statute to begin running shortly after

he encountered the work in 1953.

Whether unreasonable delay starts the statute running remains an open question

under New York law. Clearly, a party cannot delay making demand indefinitely.

However, one judge in this district has concluded that the issue of "unreasonable delay"

is relevant only to laches, not to accrual of the action. See Republic of Turkey v.

Metropolitan Museum of Art, 762 F. Supp. 44, 46 (S.D.N.Y. 1990).

Republic of Turkey involved artifacts that were excavated from burial mounds in

the Ushak region of Turkey, exported to the United States in contravention of Turkish

law, and eventually purchased by the Metropolitan Museum of Art. Id. at 45. In that

case, the Turkish government (plaintiff) was alleged to have had "actual knowledge of

the facts needed to make a demand" more than a decade and a half before it filed its

action. Id. at 46. In denying the defendant's motion to dismiss the action as time barred,

the court held that the reasonableness of the plaintiff's delay in filing suit did not bear on

the statute of limitations but was properly raised only in the context of laches. Id. at 46-

47.

This Court agrees with the reasoning of Republic of Turkey, and holds that the

issue of unreasonable delay is relevant only to the defense of laches—even where, as

here, it is undisputed that a potential plaintiff (Grosz) had actual knowledge of the

whereabouts of at least one of the missing art works (*Poet*) a half century before anyone

tried to replevy the piece. In light of the fact-sensitive nature of a laches inquiry, it would

15

be premature to resolve the question now – especially as it is unnecessary to reach the issue, because plaintiffs' suit is plainly time barred.

    C.    <u>Plaintiffs' Demand and MoMA's Refusal</u>

For purposes of deciding this motion, I will assume *arguendo* that the position taken by plaintiffs in their opposition papers—namely, that the Complaint does not allege that any of the works were purchased by the museum with knowledge that they had been stolen—is true.[3] On that assumption, the demand and refusal rule governs when the statute of limitations began to run, and plaintiffs' claims against the museum accrued on the date MoMA rejected plaintiffs' November 24, 2003 demand.[4] All parties agree that MoMA has in fact rejected plaintiffs' demand and refused to return the Paintings. They differ only on the date when rejection occurred.

Though there is little case law addressing what constitutes a "refusal" for purposes of the statute of limitations, the cases that exist hold that, "A refusal need not use the specific word 'refuse' *so long as it clearly conveys an intent to interfere with the demander's possession or use of his property.*" <u>Feld v. Feld</u>, 279 A.D.2d 393, 395 (N.Y. App. Div. 1st Dep't 2001) (citation omitted, emphasis added); <u>see also</u> <u>Spanierman Gallery v. Merritt</u>, No. 00 Civ. 5712, 2004 WL 1781006, at \*5 (S.D.N.Y. Aug. 10, 2004) (citing <u>Feld</u>). In <u>Feld</u>, a letter in response to a demand conditioned the return of disputed

---

[3] This assumption contradicts certain allegations in the complaint—notably that "Barr clearly knew that Weidler was trying to sell a stolen Grosz to him" when he purchased *Poet* (Compl. ¶ 88)—but since plaintiffs could amend their Complaint to remove those assertions (which admit only of the conclusion that MoMA was *not* a bona fide purchaser without notice), I will decide the motion as though the Complaint alleged that the museum took title to all three works in good faith.

[4] If (as is actually alleged in the Complaint) MoMA took title to *Poet* in bad faith, then absent any tolling of that limitations period (and there is no basis to toll the statute, <u>see</u> <u>infra</u> Part V), plaintiffs' claims to *Poet* have been time barred since 1956—three years after they allege that the museum knowingly acquired wrongful ownership. <u>See</u> <u>Close-Barzin v. Christie's, Inc.</u>, 51 A.D.3d 444 (N.Y. App. Div. 1st Dep't 2008).

property on the resolution of other disputes between the parties. The plaintiff insisted that the letter was not sufficiently definite to constitute "refusal" of his demand; not only did it not use the word "refuse," but it even indicated that there were circumstances under which the property might be returned at some unspecified moment in the future. But the First Department disagreed with this argument. Because the sender retained the disputed property and indicated that he would not return it unless his demands were met, his conduct was inconsistent with a plaintiff's claim of ownership, and so constituted a "refusal," thus causing plaintiff's cause of action to accrue. Feld, 279 A.D.2d at 395.

In Borumand v. Assar, No. 01 Civ. 6258, 2005 WL 741786 (W.D.N.Y. Mar. 31, 2005), a federal court in New York took the Feld doctrine one step further, holding that refusal need not be conveyed in words at all. Rather, the court explained, "Actions may be sufficient to constitute a refusal if they amount to 'an overt and positive act of conversion.'" Id. at *14 (citation omitted). In Borumand, the defendant "never explicitly informed [plaintiff] that he would not relinquish possession [but] he never in fact turned over the [chattels] and [instead] continually maintained that he would do so at some future time." Id. The court ultimately held that the plaintiff's claim accrued one year after her initial demand, since by that time, she should have "reasonably concluded" that the defendant's actions in putting her off amounted to a refusal. Id.

In line with Feld and Borumand, a court must analyze the actions as well as his words of a person who receives a demand before deciding whether and when it was refused. If either the recipient's words or actions evidences "an intent to interfere with the demander's possession or use of his property," see Feld, 279 A.D.2d at 395—which is an "overt and positive act of conversion," see Borumand, 2005 WL 741786, at *14—then

17

the demand has been refused and the cause of action accrues, even if the words "I refuse your demand" were not explicitly used. This conclusion comports with the purpose behind the demand-and-refusal rule, which is to give an innocent purchaser the opportunity to turn over chattel in his possession after learning that it had been stolen from someone else. Nothing in the rule's history or purpose suggests that a party who receives a demand, and who thereafter acts in a manner that is inconsistent with the demander's claim to ownership, should be held not to have "refused" the demand simply because he failed to recite some magic words of rejection. Actions, as we all know, can sometimes speak louder than words.

With this in mind, we examine the dealings between the Grosz Estate and MoMA in the months and years after the demand was made, which occurred in a November 24, 2003 letter from Ralph Jentsch (acting on behalf of the Grosz estate) to MoMA's Director, Glenn Lowry. (See Compl. ¶ 117 & Ex. 26.)[5]

In the twenty-nine months following receipt of that letter, MoMA took a number of actions with respect to the Paintings. It engaged researchers from Yale to look into the Paintings' provenance, met periodically with representatives of the Grosz Estate, and engaged in sporadic correspondence with Jentsch. In January 2006, the museum's Board retained former Attorney General Nicholas de B. Katzenbach to review the work that had been done and to prepare a report and recommendation for the Board. At all times while this activity was going on, MoMA retained custody of the artworks.

MoMA argues that it clearly communicated its refusal to return the Paintings in one of its letters to Jentsch—the one dated July 20, 2005—and asks the Court to dismiss

---

[5] For purposes of the demand and refusal rule, everyone agrees that this letter is the demand.

this action because plaintiffs' claims had to have accrued no later than that date.  (See MoMA MTD at 18.)

Plaintiffs argue that the museum did not reject its demand until April 12, 2006 (MTD Opp. at 9), when MoMA sent a letter notifying plaintiffs that its Board of Trustees had voted to accept Katzenbach's conclusion that the museum had no obligation to return, and should not return, *Poet* and *Self-Portrait*.[6]  (See Solomon Decl. Ex. E (Katzenbach report).)

I conclude that defendant has the better of this argument.  If MoMA's failure to return the Paintings for more than a year and a half after plaintiffs demanded them did not constitute a refusal as a matter of law (and this Court thinks that it did), then the July 20, 2005 letter—in which the defendant clearly communicated its intent to keep all three works despite plaintiffs' demand—was an act utterly inconsistent with plaintiffs' claim of right.  It thus constituted the sort of refusal contemplated by the demand and refusal rule.

MoMA's Director, Glenn Lowry, began his July 20 letter to Ralph Jentsch as follows: "I enjoyed our recent meeting and continue to appreciate the frank and open dialogue that we have created together in order to deal with the Grosz estate's questions concerning the [Paintings] at the Museum of Modern Art that are under discussion." (Solomon Decl. Ex. A at 1.)  But Lowry expressed "concern" about what he believed to be a misunderstanding by Jentsch.  Specifically, he wrote:

> I am concerned that we may have a different interpretation over some of what has been said in the last two years about these works and I want to clarify our position in order to avoid—given the importance of the issues

---

[6] *Automatons* was not mentioned in the Katzenbach report.  In fact, the work is mentioned only in the November 24, 2003 demand letter and in Lowry's July 20, 2005 letter to Jentsch.  After that, all mention of *Automatons* ceases.  The parties have not explained why, and in view of the Court's conclusion the reason is irrelevant.

under consideration—any confusion.  We have, as you know, a fiduciary
obligation to our collection.  Before we remove a work from the
Museum's collection, we need to establish convincing and conclusive
evidence that another party—in this instance, the Estate of George
Grosz—has ownership rights superior to the Museum's. . . . For this
reason, I think it is critical to state that I never said—nor could I have
said—that MoMA would restitute the Grosz works if no documents could
be found contradicting the documentation for your initial restitution claim.

(Id.)

Lowry explained the museum's position on *Poet*:

I think it is fair to say that we have now reached a point where it appears
that no more information is currently available for us to consider, a point
on which I sense, we both agree.  We have, however, reached somewhat
different conclusions about the results of our extensive study of the
provenance of [*Poet*]: we believe that the available evidence *does not lead
to any definitive conclusion that challenges the Museum's ownership of
the picture.  In fact, much of what we know argues in favor of MoMA's
clear title*.

(Id. (emphasis added).)

With respect to the other two Paintings (*Self-Portrait* and *Automatons*), Lowry

stated: "Although we are aware of the restitution of a painting with similar provenance

[to *Self-Portrait*], based on the material that you have shared with us, and on our own

extensive research—much of which we have done in collaboration with Yale

University—*we cannot reach the conclusion that restitution of either this picture [Self-

Portrait], or of the drawing, Republican Automaton, would be appropriate at this time.*"

(Solomon Decl. Ex. A at 2) (emphasis added).

Lowry's statements, especially the highlighted portions thereof, plainly indicate

that, as of July 20, 2005, MoMA rejected plaintiffs' assertion that they had an immediate

right to possession of the three Grosz works. Lowry plainly asserts that MoMA has

superior title to *Poet,* and stated that it "could not conclude" that plaintiffs were entitled

20

to possession of either *Self-Portrait* or *Automaton*. And he stated that the museum intended to keep all three paintings (at least "at this time")—which it did.

Lowry's July 20, 2005 letter, coupled with the museum's continued retention of the works after it was sent, indicates its continuing intent to interfere with the rights asserted by plaintiffs in their demand. This is all the "refusal" the law could possibly require before plaintiffs' causes of action for conversion and replevin (as well as the corresponding equitable claims) accrued. After reading the July 20 letter, no reasonable person could have concluded that MoMA agreed with plaintiffs' assertion that they were the rightful owners of the Paintings, and as such were entitled to immediate possession of them. The only conceivable reading of the letter is that MoMA emphatically disagreed with plaintiff's position—a reading that is supported by its continued retention of the purportedly purloined Paintings, which, as the Borumand court ruled, is an "overt and positive act of conversion." See Borumand, 2005 WL 741786, at *14. Therefore, this Court holds that plaintiffs' claims accrued, and the limitations period began to run, on July 20, 2005.

Underscoring this conclusion is the fact that the parties had previously agreed that MoMA would respond to plaintiffs' demand no later than March 2005 (Solomon Decl., Ex. D at 1-2). By the time the July 20, 2005 letter was sent, the museum had already kept the Paintings for three months beyond the date it set for answering the demand—which is itself an "overt and positive act of conversion."

Plaintiffs dispute the conclusion that MoMA had refused their claims on July 20, 2005. They insist that MoMA's July 20 letter does not constitute a sufficiently clear

rejection of their claim. They base this argument on Lowry's use of temporizing

language elsewhere in his letter. Specifically, with respect to *Poet*, he said:

> In the spirit of friendship and recognition of the limitations on the present
> state of our knowledge about the provenance of the work, I suggested the
> possibility of shared ownership of [*Poet*] at our May 31 meeting. I did
> this not out of a conviction that the picture was tainted in some way, but
> because shared ownership would be a gracious, amicable means of
> addressing the fact that we may never be able to understand fully the
> work's history in the decades before the Museum purchased it in 1952.
> . . . .
> I proposed five or ten year benchmarks as opportunities for MoMA and
> the Grosz Foundation to review their positions and to consider any new
> information that might come to light. If further research produced
> conclusive facts, one way or another, either the Foundation or MoMA
> could withdraw its ownership claims. If no new or conclusive evidence
> comes to light, the shared arrangement could continue, more or less in
> perpetuity.

(Id. at 2.) Plaintiffs also note that Lowry invited Grosz family to meet with museum

representatives sometime in the "early fall" "to review the facts and determine an

appropriate course of action. . . . to best serve[ ] the needs of George Grosz." (Id.)

Insofar as plaintiffs interpret these statements as having somehow tempered the

museum's clearly stated refusal to return the artworks "at this time," as well as its flat-out

rejection of plaintiffs' claims to ownership of *Poet*, their interpretation is misguided.

Lowry's temporizing language was almost certainly designed to entice plaintiffs to

continue negotiating and to prevent the dispute from becoming public or escalating into

litigation. And indeed, throughout the parties' dealings, MoMA indicated a willingness

to resume looking into the matter anew if new evidence surfaced—as any responsible

museum would. (See Solomon Decl. Ex. Λ at 2 (July 20, 2005 letter from G. Lowry to

R. Jentsch); id. Ex. E at 1 (April 12, 2006 letter from G. Lowry to R. Jentsch).)

However, nothing Lowry said contradicts his clearly stated rejection of plaintiffs' demand that the three Paintings be returned to them, the "rightful" owners. The fact that additional research or evidence might someday cause MoMA to alter the conclusions it had obviously reached by July of 2005 is irrelevant to whether plaintiffs' causes of action accrued. Plaintiffs made a demand for return of the works in November 2003. At some point MoMA had to return the Paintings in order to avoid converting them. In the July 20, 2005 letter, it expressly refused to do so. The museum's suggestions about "shared ownership" of *Poet* pending "further research," and future meetings to "review the facts," suggest that perhaps MoMA might one day be open to giving plaintiffs one or more of the works—but that is no different from the Feld defendant's assertion that he would return the stolen property if the parties could resolve their other disputes. The museum's actions and its statements were inconsistent with the demander's claim to ownership of the works.

In sum, MoMA had reached a conclusion after nearly two years of research; its conclusion was inconsistent with plaintiffs' claim of ownership; Lowry, acting on behalf of MoMA, communicated that conclusion to plaintiffs; and the museum kept the Paintings after Lowry sent that message. From and after that moment when Lowry sent the July 20, 2005 letter, plaintiffs were on notice that their demand (which was for immediate possession of the works) had been refused. At that point, their rights of action were fully ripe, and the three year limitations period began to run.

Plaintiffs' contend, in conclusory fashion, that they relied on Lowry's temporizing language to forbear from bringing suit. But two letters written by Jentsch in January 2006—more than three years prior to the commencement of suit on April 12, 2009—

make it clear beyond peradventure that Jentsch understood that plaintiffs' demand had been refused.  (See Solomon Decl. Exs. C & D.)

In the first letter, dated January 5, 2006, Jentsch sought to "memorialize the substance" of a meeting he had previously had with Lowry.  According to Jentsch, the purpose of that meeting was "to clarify once and for all MoMA's position with regard to the restitution to the Grosz Estate of two works [*Poet* and *Self-Portrait*] by George Grosz."  (Id. Ex. C at 1.)  Jentsch wrote: "I presented to you [Lowry] a letter authorized by the George Grosz heirs demanding return of the two works by February 3, 2006.  *You rejected the demand and advised that the works would not be returned by this date or any date.*"  (Id. (emphasis added).)[7]

The second letter, dated January 20, 2006 (see Solomon Decl. Ex. D.),  is even more compelling evidence that plaintiffs (through their representative) well knew that MoMA had rejected their original demand the summer before.  Jentsch not only reiterated his understanding that MoMA was not going to return the Paintings, but acknowledged that MoMA had "outright declined restitution" of the works in Lowry's "letter to me, July 20, 2005."  (Id. at 2 (emphasis added, errors in original).)  Jentsch went on to say, "I responded to you in a letter August 11, 2005, and asked you the question on what basis MoMA would *deny restitution* of the oil 'Maler und Modell' [*Self-Portrait*]. . . ."  (Id.

---

[7] Whatever was said at the referenced meeting to cause Jentsch to write the January 5, 2006 letter, Lowry absolutely refused to countenance plaintiffs' demand for the return of the Paintings by February 3, 2006—which he called their "ultimatum."  In a letter dated January 18, 2006, Lowry wrote: "the Museum of Modern Art has determined not to respond to your ultimatum."  (Dowd Decl. Ex. 1 at 2).  As the Paintings were obviously not conveyed to plaintiffs by February 3, 2006 deadline Jentsch imposed, it is obvious that this later demand, too, was explicitly rejected by the museum well before April 12, 2006—in any event, no later than February 3, 2006, when the Paintings stayed where the were.  If we were to ignore everything that went before, and accept February 3, 2006, as the date of the museum's refusal (of plaintiffs' demand that the Paintings be returned by that date), this lawsuit was still filed more than two months too late.  However, that is not the conclusion the Court has reached.

(emphasis added).)  Jentsch's statements in this second letter fully support the court's conclusion that the statute began to run no later than July 20, 2005.

Plaintiffs' claims to all three Paintings are thus time barred under the demand and refusal rule.

**V.    Equitable Tolling**

Anticipating a finding that their claims are stale, plaintiffs suggest that this Court apply the doctrine of equitable tolling to suspend the statute of limitations for the period of "compromise negotiations from 2003 to April 12, 2006."  (MTD Opp. at 12.)   In support of their argument, plaintiffs cite two cases: Smith v. McGinnis, 208 F.3d 13 (2d Cir. 2000), and Lord Day & Lord v. Socialist Republic of Vietnam, 134 F. Supp. 2d 549 (S.D.N.Y. 2001).  In neither of these cases did the court conclude that the limitations period should be equitably tolled, and in any event both are factually inapposite.  Insofar as they are at all relevant, these cases establish that equitable tolling "applies only in the 'rare and exceptional circumstance,'" and is appropriately invoked only where a plaintiff has "acted with reasonable diligence throughout the period he seeks to toll."  Smith, 208 F.3d at 17 (citations and alterations omitted).  In other words, the plaintiff must *show* that he has been 'prevented in some extraordinary way from exercising his rights.'  Id. (internal quotations omitted).  This case does not present one of the "rare and exceptional circumstances" in which any tolling of the limitations period would be equitable.

Although plaintiffs contend that the entire two and one half year period of negotiations ought to be excluded from the limitations period, they do not explain why this should be so.  Instead, plaintiffs argue as follows: "On January 18, 2006, Lowry wrote to the [plaintiffs] telling them to wait and assuring them that MoMA had not refused their

claims until the Board considered the Katzenbach report and made their decision.

Lowry's January 18, 2006 letter equitably tolls the statute of limitations because the

[plaintiffs] reasonably relied on it." (MTD Opp. at 12.) It thus appears that plaintiffs are

contending that the museum's decision to involve the Board in the matter, and the

Board's retention of Katzenbach to review the situation, is the basis for an equitable toll,

because it somehow led plaintiffs to believe that MoMA had not yet refused their

demand.

      This argument is utterly unpersuasive.

      First of all, in the January 18 letter to which plaintiffs refer, Lowry did not

disavow MoMA's determination to keep the Grosz works in its collection in derogation

of plaintiffs' purported rights. On the contrary, he emphasized that the museum—

although willing to return works of art in the face of legitimate claims—had no reason to

question its conclusion that plaintiffs' claims were unfounded:

> The Museum of Modern Art has demonstrated that it is willing to engage
> in serious, scholarly provenance research on works in its collection. We
> have further demonstrated that, where the facts support it, we are willing
> and able to conclude that a claim is legitimate and that someone else has
> an ownership right superior to the Museum's . . . . *No such compelling*
> *facts exist in this instance.*

(Dowd Decl. Ex.1 at 2, emphasis added.) Lowry indicated that the museum's Board had

decided to retain Katzenbach "notwithstanding that" (i.e., notwithstanding the fact that

there was no compelling evidence to support plaintiffs' claims), but he plainly stated:

> We take this extraordinary step [of asking Katzenbach to review the
> matter] not out of any sense of uncertainty about our conclusions, or any
> wavering in our resolve, but rather to obtain an intelligent, candid,
> independent assessment of the situation.

(Id.)

The January 18 letter underscores, rather than undermines, the museum's previously-stated belief that it had superior rights in the works in suit. It suggests no "sense of uncertainty about our conclusions" and no "wavering in our resolve." If I may paraphrase, the January 18 letter says, "We still think we were right—in fact, we have no reason at all to think we were wrong—back on July 20, when we told you we would not give you the Paintings. But because we are the Museum of Modern Art, we are going to ask an outsider to look at the matter yet again." In the context of everything that had gone before, Lowry's statements on January 19, 2006, gave plaintiffs no reasonable basis to conclude that MoMA's July 20, 2005 letter did not constitute a rejection of their original demand—as Jentsch himself recognized in a letter sent to Lowry only two days later.

Furthermore, there is a logical flaw in plaintiffs' argument that the statute ought to be equitably tolled for the entire twenty-nine month period of its interaction with MoMA. Katzenbach's retention did not and could not alter or undo the fact that the museum had refused plaintiffs' demand some six months earlier. Put otherwise, the Board's action did not cause a claim that had accrued 182 days earlier to "unaccrue" and restart the limitations clock at Day One. At best, what plaintiffs can argue is that the Board's decision to commission a report from Katzenbach tolled (suspended) the running of the statute during the period while he did his work—i.e., from January 18 until April 12, 2006—a period of 84 days. Adding 84 days to the limitations period moves the date by which suit had to be brought from July 20, 2008, to October 13, 2008—which is not enough to save plaintiffs' Complaint from dismissal.

Finally, plaintiffs have not established that the circumstances surrounding their lengthy period of inaction "adversely affected [their] capacity to function generally or in relationship to the pursuit of [their] rights." Pena v. Potter, 326 Fed. App'x 33, 35 (2d Cir. 2009) (citation omitted). The Second Circuit has explained that a plaintiff must do more than declare that equitable tolling is appropriate in order to establish his right to such relief. See Boos v. Runyon, 201 F.3d 178 (2d Cir. 2000) (single sentence alleging mental illness insufficient). But in this case, that is all plaintiffs have done. Nothing in Lowry's January 18, 2006 letter or in the Board's retention of Katzenbach prevented the plaintiffs from bringing suit during the period when Katzenbach was reviewing the matter or at any time thereafter. Indeed, by January 18, 2006, litigation was clearly warranted—more than two years had passed since plaintiffs had made their original demand, MoMA still had not returned the Paintings, and it had repeatedly indicated that it would not do so.

Accordingly, this Court declines to apply equitable tolling to suspend the running of the limitations period for the period November 2003 until April 12, 2006.

## CONCLUSION

The defendant's motion to dismiss is granted.  The Clerk of the Court is instructed to remove the motion to dismiss (Docket No. 13) from the Court's outstanding motion list, and to enter judgment for defendant dismissing the case.

In view of the disposition of the motion, the pending Objection to the Magistrate Judge's ruling on a discovery dispute (Docket No. 55) is moot.

This constitutes the decision and order of this Court.

Dated: January 6, 2010

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

29